## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONNECTICUT STATE CONFERENCE OF NAACP BRANCHES, LEAGUE OF WOMEN VOTERS OF CONNECTICUT, and GLORIA FRANCESCONI, | |
| Plaintiffs, | No. 20-cv-909 |
| v. | |
| DENISE W. MERRILL, in her official capacity as Secretary of the State of Connecticut, | July 2, 2020 |
| Defendant. | |

### Complaint

1.      Connecticut Secretary of State Denise Merrill remarked that in "[i]n Connecticut, no one should be forced to choose between protecting their health and exercising their right to vote."[1] Despite this laudable and constitutionally vital goal and the brutal toll the novel coronavirus, COVID-19, continues to inflict on the State, Connecticut has retained one of the most restrictive mail voting systems in the nation for the November general election. This action seeks to remedy the violation of the fundamental right to vote for the many thousands of Connecticut citizens who cannot safely vote at the polls and do not meet one of Connecticut's narrow requirements to vote by mail—and in doing so, seeks to preserve their health and that of the Connecticut public.

2.      We are months into a deadly pandemic that now has afflicted over 46,000

---

[1] Ltr. from Conn. Sec. of State Denise Merrill at 1 (May 2), https://authoring.ct.gov/-/media/SOTS/ElectionServices/2020-Voting-Plan-FINAL-DRAFT-May-2-715-PM.pdf?la=en.

Connecticut residents and killed over 4,300,[2] prompting Governor Ned Lamont to declare a public health emergency and to issue a number of restrictions to promote social distancing including closing nonessential business and requiring the use of face masks in many public places. Indeed, this Court has explained in a recent order that due to advice from the U.S. Centers for Disease Control and Prevention ("CDC") that "the best way to prevent illness is to avoid being exposed to the virus, through, among other means, social distancing," and thus has significantly adapted its own operating procedures.[3]

3.      Yet this summer will not mark of the end of this pandemic in the United States, with cases surging in the majority of the county and National Institute of Allergy and Infectious Diseases Director Dr. Anthony Fauci warning that new cases could soon reach record levels of 100,000 new cases a day.[4] Over 126,000 Americans have already been killed by the coronavirus.[5] In fact, Director of the CDC Robert Redfield has announced that 24 million Americans have likely already been infected by COVID-19—a figure ten times higher than the number of confirmed cases—and that the pandemic is still in its early stages, with much greater potential for causing harm than has been seen thus far. [6] The current crisis only recently reached its first "peak" in Connecticut, but it will still pose a grave public health risk in the fall—

---

[2] *COVID-19 Update June 30, 2020*, CT.gov (Jun. 30, 2020), https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary6302020.pdf.

[3] Superseding Gen'l Order, *In re Ct. Operations under the Exigent Circumstances Created by COVID-19* (D. Conn. Apr. 27, 2020) (providing that in-person proceedings would be halted through June 15, 2020).

[4] *See* Sheryl Gay Stolberg and Noah Weiland, *Fauci Says U.S. Could Reach 100,000 Virus Cases a Day as Warnings Grow Darker*, N.Y. Times (June 30, 2020, updated July 1, 2020), https://www.nytimes.com/2020/06/30/us/politics/fauci-coronavirus.html.

[5] Ctrs. for Disease Control & Prevention, *Cases and Deaths in the U.S.* (last updated Jun. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html.

[6] Lena H. Sun & Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported: Agency expands list of people at risk of severe illness, including pregnant women*, Wash. Post (Jun. 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/.

potentially an even greater risk than the first peak. Both experts like Dr. Fauci and reliable models project that even in places where the current outbreak subsides briefly, infection rates will rebound again by the fall.[7] Indeed, new cases are once again on the rise in at least 35 states and territories and are only decreasing in four.[8]

4.      Yet despite the importance of maintaining social distancing, and the predicted next wave of infections, hospitalizations, and deaths, Connecticut has adapted its mail voting requirements *only* for the August primary. All registered voters in Connecticut will now be able to vote by mail ballot for the August election, but the State has not yet taken similar action to protect public health and individual safety during the November general election, despite the hardships the pandemic will certainly pose at that time. This inaction threatens public health while disenfranchising at minimum tens of thousands—if not hundreds of thousands—of Connecticut voters who are unable to qualify for one of the narrow exceptions under state law to vote by mail and rightfully believe it will be unsafe for them to vote in person. And while the Secretary has provided a memorandum of opinion expanding the definition of illness to individuals with preexisting conditions and some other limited categories of Connecticut residents, her interpretation appears to apply only to the August primary.[9]

---

[7] *See* Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/; *Dr. Fauci anticipates coronavirus outbreak in the fall*, CountOnNews2 (Mar. 31, 2020) ("Fauci said he anticipates coronavirus will be cyclical and return in the fall because of its degree of transmissibility."), https://www.counton2.com/news/national-news/dr-fauci-anticipates-coronavirus-outbreak-in-the-fall/.

[8] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (updated July 1, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=RelatedLinks&pgtype=Article.

[9] *See* Office of the Secretary of State, *Memorandum of Opinion* (May 6, 2020), https://portal.ct.gov/-/media/SOTS/ElectionServices/LEAD_Communications/2020/AB-COVID-Opinion.pdf?la=en (providing that voters with "a pre-existing illness" as well as "individuals who may have been in contact with a COVID-19 infected

5.      Those who are most susceptible to severe illness if they contract COVID-19 (including individuals with certain preexisting medical conditions and senior citizens) are not currently eligible to vote absentee in November unless they are "ill" at the time of their ballot request. Connecticut voters without preexisting conditions who are nonetheless rightfully concerned about COVID-19 transmission and its consequences are also unable to vote using the absentee process for the November election.

6.      These consequences fall especially heavily on Black voters in Connecticut— including many of the approximately 10,000 members of Plaintiff Connecticut State Conference of the NAACP—who are being afflicted by COVID-19 at significantly disproportionate rates. Connecticut's history of discrimination against Black residents, as well as continuing discrimination in areas such as education, employment, and healthcare, interacts with Connecticut's narrow absentee voting requirements to hinder their ability to participate effectively in the political process in violation of Section 2 of the Voting Rights Act. As an astute journalist remarked about COVID-19's disproportionate toll on Black Americans, "we cannot skirt the fact that what is a nuisance for one person is another person's plague."[10]

7.      Therefore, Plaintiffs challenge the requirement setting forth exclusive categories of persons who "may vote by absentee ballot" in Connecticut (the "Excuse Requirement") in the context of COVID-19 community transmission. *See* Conn. Gen. Stat. § 9-135. A voter who does not qualify under any of the listed categories must vote in-person on Election Day, or not vote at

_____

individual such as healthcare workers, first responders, individuals who are caring for someone at increased risk, as well as those that feel ill or think they are ill because of the possibility of contact with the COVID-19 virus" can vote absentee due to illness in the August 11, 2020 primary election).

[10] Michele L. Norris, *The 'us and them' pandemic shows America is still impervious to black pain*, Wash. Post., May 21, 2020, https://www.washingtonpost.com/opinions/2020/05/21/us-them-pandemic-shows-america-is-still-impervious-black-pain/#click=https://t.co/oTQc47yJMt.

all. In continuing to hew to the restrictive categories set out in this statute and failing to allow absentee voting for individuals who—while not ill or symptomatic themselves, risk contracting COVID-19 or transmitting the virus to others through in-person voting—Defendant has forced Connecticut voters who seek to vote in the November election to make an untenable decision: to risk the health of themselves and their household members or to give up their right to vote.

8.     The Excuse Requirement unreasonably burdens Plaintiffs' members, Ms. Francesconi's, and many similarly situated Connecticut voters' fundamental right to vote because it does not allow them to practice recommended physical distancing to protect personal and community health. Plaintiffs therefore respectfully request that the Court enjoin Connecticut's Excuse Requirement to vote absentee during community transmission of COVID-19 and declare this requirement unconstitutional during continuing community transmission, including for the November general election.

## PARTIES

9.     Plaintiff Connecticut State Conference of NAACP Branches ("NAACP-CT") is a non-profit, non-partisan organization principally headquartered at 2074 Park Street, in Hartford, Connecticut that is part of the National Association for the Advancement of Colored People. NAACP-CT has 30 local units in various parts of the state. NAACP-CT's mission is to secure the political, educational, social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons. The organization envisions a society in which all individuals have equal rights without discrimination based on race. The NAACP's game plan for eliminating race-based inequality and discrimination in the twenty-first century focuses on six areas, including Voting Rights and Political Representation.

10.    NAACP-CT has approximately 10,000 members, most of whom reside in

Connecticut and many of whom are registered voters in Connecticut. Some of these members wish to vote via absentee ballot during the November 2020 election because of the risk of COVID-19 transmission, even though many of them do not qualify under current law. The majority of NAACP-CT's members are fifty-five years old or older and a significant number are older than age 65, and are thus particularly susceptible to severe infection or death from COVID-19. NAACP-CT also has a youth leadership arm. A significant portion of NAACP-CT's members have underlying health conditions that put them at heightened risk of hospitalization or death if they are exposed to COVID-19.

11.     NAACP-CT regularly expends significant resources on get-out-the-vote efforts (including voter registration) and other election-related programming. As part of this effort, NAACP-CT regularly shares information about voting rules and procedures with its membership. NAACP-CT anticipates that it will have to divert additional resources from its regular get-out-the-vote activities to advocate for suspension of the Excuse Requirement and to conduct outreach to its members to ensure they understand whether they are eligible to vote absentee during the November election. Indeed, NAACP-CT leaders have already been fielding questions from their membership about whether and how they will be able to safely vote in upcoming elections, in light of COVID-19.

12.     NAACP-CT has also devoted significant organizational resources to research, education, and advocacy to minimize the harmful impacts of COVID-19 on its membership and on racial minorities in Connecticut, generally. For example, the organization has convened a "COVID-19 Urban Strategic Planning Committee" composed of over 100 local officials, experts, and leaders which regularly meets.

13.     Plaintiff League of Women Voters of Connecticut ("LWVCT" or "the League") is

6

a membership organization dedicated to promoting civic engagement and protecting democracy through advocacy, voter education, and voter assistance. LWVCT is an affiliate of the League of Women Voters of the United States which was founded in 1920 to enfranchise more than 20 million voters and the organization's mission is to empower voters and defend democracy. As part of its mission, LWVCT advocates for the expansion of voting opportunities, including through vote-by-mail, and provides information directly to members who wish to vote by mail, including providing links on its website where members can find information about voting by mail. LWVCT shares this voter education information during in-person and virtual events.

14.     LWVCT has 1536 members across the state and 25 local Leagues. A substantial number of LWVCT members intend to vote by mail in August and Connecticut's other upcoming elections including November if able. LWVCT membership is broad and diverse and includes many individuals who due to age, disability, and/or other preexisting conditions are at a heightened risk of contracting COVID-19. The League's members who are registered voters will not be able to vote in person due to the COVID-19 public health crisis without risking their health and safety. This includes members who do not meet the current Excuse Requirement to qualify for a mail-in ballot.

15.     The League has members who are election officials and poll workers or work directly with poll workers and other election officials who will need to assist voters on Election Day regarding any new rules around how to cast a ballot. Without action now, the League will face an increased burden to avoid widespread confusion for poll workers and election officials, resulting in eligible voters being disenfranchised. A substantial part of the League's work includes registering voters and generally encouraging voter participation in elections, but its work to educate voters about who may and may not vote by absentee ballot in light of the Excuse

Requirement has already and will continue to cause the League to divert resources from other priority areas including voter registration and participation efforts. Additionally, the League has created a CT VOTES! Campaign that focuses on voter registration, voter education and efforts to encourage citizens to vote in the 2020 general election in November. Many Connecticut citizens rely on and trust the nonpartisan election information provided by the League. This campaign needs to be able to distribute to voters accurate information about voting well in advance of the 2020 general election due to the complexities of absentee voting—which will be unfamiliar to many voters. Connecticut's maintenance of the Excuse Requirement for the November general election will increase the complexity and cost of that campaign, draining additional resources from other programmatic areas. Additionally, LWVCT anticipates that many voters will be confused about their eligibility to cast an absentee ballot in November if the Excuse Requirement is not suspended for the 2020 general election, given that many voters will have voted via absentee ballot in the August 11, 2020 primary election who are not currently eligible to vote absentee for the November 3, 2020 general election.

16.     Plaintiff Gloria Francesconi is an 88-year-old registered voter who lives in Trumbull, Connecticut. She is also a member of the League. She has voted in person in nearly every election since she turned 21but is now greatly concerned about contracting COVID-19 while voting in person. Because of her age, she runs a higher risk of serious complications or death if she contracts COVID-19, and therefore has been practicing social distancing since the outbreak began. Because of these significant risks to her health, Ms. Francesconi would like to vote by absentee ballot for the November general election but does not meet any of the statutory criteria in the Excuse Requirement for the November election. If the Excuse Requirement is enjoined, however, or if the State expands the Excuse Requirement to allow all registered voters

to vote by absentee ballot during COVID-19 transmission as it did for the August primary, Ms. Francesconi would be able to safely vote by absentee ballot. If the Excuse Requirement is not lifted or enjoined, she will be forced to either risk her health to vote in November or not vote at all.

17.     Defendant Denise W. Merrill is the Secretary of State of Connecticut. As Secretary of State, she is Connecticut's Commissioner of Elections and thus its chief election official, "with such powers and duties relating to the conduct of elections as are prescribed by law." Conn. Gen. Stat. § 9-3(a). As Commissioner, the Secretary has duties to, among others: "advise local election officials in connection with proper methods of conducting elections"; "prepare regulations and instructions for the conduct of elections, as designated by law"; and "prescribe, provide and distribute absentee voting forms for use by the municipal clerks." Conn. Gen. Stat. § 9-4. During any municipal, state or federal election, primary or recanvass, or any audit conducted pursuant to section 9-320f, "the Secretary of the State may issue an order. . . to any registrar of voters or moderator to correct any irregularity or impropriety in the conduct of such election." Conn. Gen. Stat. § 9-3(b).

18.     Unless otherwise provide by law, "the Secretary's regulations, declaratory rulings, instructions and opinions, if in written form, and any order issued under subsection (b) of this section, shall be presumed as correctly interpreting and effectuating the administration of elections and primaries under this title." *Id.* Additionally, the "Secretary of the State may make any changes in any forms prescribed" in the absentee voting laws "which, in the opinion of said secretary, are necessary to conform to the applicable provisions of federal law." Conn. Gen. Stat. § 9-139b. In fact, Secretary Merrill used her authority as Commissioner of Elections for the state to advise local election officials that a broad set of voters would be able to use the "illness"

excuse to vote via absentee ballot during the August 11 primary.[11] Secretary Merrill is sued in her official capacity.

## JURISDICTION AND VENUE

19.     This action arises under the First and Fourteenth Amendments to the U.S. Constitution and the Voting Rights Act and is brought under 42 U.S.C. §§ 1983 and 1988 and 52 U.S.C. §§ 10301, 10302(b) and 10501 to seek injunctive and declaratory relief for violations of constitutional rights under color of state law. This Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

20.     This Court has personal jurisdiction over Defendant, who is sued in her official capacities as a state official. The violations complained of concern their conduct in such capacities.

21.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

22.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant resides in this judicial district, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred there.

## STATEMENT OF FACTS

### I.      Transmission of COVID-19 and Public Health Guidelines

23.     Our nation faces a public health emergency caused by the exponential spread of COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2. According to the CDC, this coronavirus spreads aggressively and asymptomatic people can spread it.[12] All age

---

[11] *See* Office of Sec'y of State, *supra* n.9.

[12] Ctrs. for Disease Control & Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last updated Jun. 16, 2020).

groups have contracted the disease.[13]

24.     The United States is the current epicenter of the global COVID-19 pandemic. It leads the world in the total number of COVID-19 cases with now over 2.58 million.[14] To date, over 126,000 Americans have died from COVID-19.[15]

25.     The World Health Organization (WHO) estimates that approximately 20% of those who are infected by SARS-CoV-2 require hospitalization.[16] COVID-19 can severely damage tissues in the lung, kidney, heart, and liver.[17] Surges of COVID-19 cases have strained healthcare systems in several regions, causing critical shortages of doctors, nurses, hospital beds, medical equipment, and personal protective equipment (PPE).[18]

26.     Estimates from early March put the fatality rate for people infected with COVID-19 at approximately ten times higher than even a severe flu season, including in countries with advanced healthcare systems.[19]

---

[13] Robert Verity, PhD. et al., *Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis* at 6, Lancet Infec. Dis. (Mar. 30, 2020), https://www.thelancet.com/action/showPdf?pii=S1473-3099%2820%2930243-7.

[14] Ctrs. for Disease Control & Prevention, *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated July 1, 2020).

[15] *Id.*

[16] World Health Organization, Q&A on Coronaviruses (COVID-19), "What are the Symptoms of COVID-19?," https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited July 1, 2020).

[17] Lois Parshley, *The Emerging Long-term Complications of Covid-19, Explained*, Vox (June 12, 2020), https://www.vox.com/2020/5/8/21251899/coronavirus-long-term-effects-symptoms (citing studies).

[18] *See, e.g., Covid-19, Fnancial Distress and the Struggle to Stay off the Critical List: One Hospital's Story*, Wash. Post (May 13, 2020), https://www.washingtonpost.com/health/2020/05/13/coronavirus-damaged-hospital-financial/?arc404=true (describing the severe operational and financial challenges Griffin Hospital in Derby, Connecticut has faced due to COVID-19); Margaret Barthel & Jenny Gathright, *Stretched D.C.-Area Hospital Workers Say They Need More Protective Gear—And Hazard Pay*, DCist (May 21, 2020), https://dcist.com/story/20/05/21/stretched-d-c-area-hospital-workers-say-they-need-more-protective-gear-and-hazard-pay/.

[19] Betsy McKay, *Coronavirus vs. Flu: Which Virus is Deadlier*, Wall St. J. (Mar. 10, 2020), https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879; *see also Castillo v. Barr*, No. 20-00605, 2020 WL 1502864, at *2 (C.D. Cal. Mar. 27, 2020) ("COVID-19 is highly contagious and has a mortality rate ten times greater than influenza.").

27.     People of all ages have contracted COVID-19 and died from it, but the illness poses special risks for the elderly and those with certain preexisting medical conditions. As the CDC has explained, the risk of getting severely ill from COVID-19 increases as you get older, with 8 out of 10 COVID-19-related deaths in the United States occurring among adults aged 65 years and older.[20] COVID-19 also poses greater risks for people with preexisting heart and respiratory conditions, individuals with compromised immune systems, and those with many other conditions.[21] The CDC has also found that some people with disabilities are at a higher risk of infection or severe illness because of their underlying medical conditions.[22]

28.     The effects of the pandemic on everyday life will likely last well through and past the 2020 election cycle.[23] Experts have indicated that COVID-19 "as a virus new to humans, will face less immunity and thus transmit more readily even outside of the winter season," and that season changes are "unlikely to stop transmission."[24] And as emerging diseases expert Amesh Adalja of the Johns Hopkins University Center for Health Security recently stated, "October

---

[20] Ctrs. for Disease Control & Prevention, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated June 25, 2020).

[21] Ctrs. for Disease Control & Prevention, *People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last updated June 25, 2020).

[22] Ctrs. for Disease Control & Prevention, *People with Disabilities*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last updated Apr. 7, 2020); Ctrs. for Disease Control & Prevention, *CDC Updates, Expands List of People at Risk of Severe COVID-19 Illness* (June 25, 2020), https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html.

[23] *See, e.g., League of Women Voters of Virginia v. Virginia State Bd. of Elections*, No. 6:20-CV-00024, 2020 WL 2158249, at *6 (W.D. Va. May 5, 2020) (noting "the evidence in the record that the COVID-19 pandemic will likely pose a threat during [the November 2020] election").

[24] Marc Lipsitch, DPhil, Professor of Epidemiology and Director, Center for Communicable Disease Dynamics, Harvard T.H. Chan School of Public Health, *Seasonality of SARS-CoV-2: Will COVID-19 Go Away on its Own in Warmer Weather?*, https://ccdd.hsph.harvard.edu/will-covid-19-go-away-on-its-own-in-warmer-weather/ (last visited July 1, 2020).

2020 won't look nothing like October 2019."[25] As a recent report from the Center for Infectious Disease Research and Policy at the University of Minnesota found, "this outbreak will likely last 18 to 24 months" and "likely won't be halted until 60% to 70% of the population is immune."[26] Further, even those who develop an immune response to the virus after an infection are not necessarily safe from reinfection, as we do not yet have sufficient data about how long immunity to the virus will last.[27] And, the CDC Director recently estimated that only 5-8% of the United States population has been infected with COVID-19 thus far.[28]

29.     There is no known effective treatment for COVID-19 and any effective, publicly available vaccine is highly unlikely to be available before 2021.[29] As National Institute of Allergy and Infectious Diseases Director Dr. Anthony Fauci testified before the Senate, "the idea of having treatments available, or a vaccine" by this this fall "would be something that would be a bit of a bridge too far."[30] And even if a vaccine could be developed by the fall, Dr. Fauci has explained that "there's no guarantee that the vaccine is actually going to be effective."[31] Yet

---

[25] Sharon Begley, *3 Potential Futures for COVID-19: Recurring Small Outbreaks, a Monster Wave, or a Persistent Crisis*, Boston.com (May 5, 2020), https://www.boston.com/news/coronavirus/2020/05/05/3-potential-futures-covid-19.

[26] Kristine A. Moore, et al., *COVID-19: The CIDRAP Viewpoint, Part 1: The Future of the COVID-19 Pandemic: Lessons Learned from Pandemic Influenza*, Ctr. for Infectious Disease Research & Policy, Apr. 30, 2020, https://www.cidrap.umn.edu/sites/default/files/public/downloads/cidrap-covid19-viewpoint-part1_0.pdf.

[27] Robert D. Kirkcaldy, MD, MPH, et al., COVID-19 and Postinfection Immunity: Limited Evidence, Many Remaining Questions, JAMA 2245–2246 (May 11, 2020); Apoorva Mandavilli and Katie Thomas, *Will an Antibody Test Allow Us to Go Back to School or Work?*, N.Y. Times (Apr. 10, 2020), https://www.nytimes.com/2020/04/10/health/coronavirus-antibody-test.html.

[28] Lena H. Sun & Joel Achenbach, *CDC Chief Says Coronavirus Cases May Be 10 Times Higher Than Reported: Agency Expands List of People at Risk Of Severe Illness, Including Pregnant Women*, Wash. Post (Jun. 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/.

[29] *See, e.g.,* Decl. of Dr. Arthur L. Reingold, *League of Women Voters of Virginia v. Virginia State Bd. of Elections*, No. 6:20-CV-00024, Dkt. No. 17-1 ¶¶ 12-15 (Apr. 21, 2020).

[30] *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 32, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12.

[31] *Id.* at 19, 92.

public health experts warn that the virus will continue to pose a serious threat to public health and safety until that point.[32] Public health officials thus are urging the public to practice 'social distancing,' frequent (and thorough) hand washing, and avoidance of close contact with others.[33] Governor Lamont has prohibited "indoor social and recreational" gatherings of more than 10 people and has prohibited outdoor gatherings of more than 25 people and allowed larger gatherings only for strictly distanced "drive-in" religious, spiritual, and worship gatherings and "drive-in" graduation ceremonies.[34]

30.     Dr. Anthony Fauci, head of the National Institute of Allergy and Infectious Diseases and member of the White House's coronavirus taskforce, recently called the a second round of COVID-19 in the fall "inevitable" and explained that the severity of the next wave will depend on factors like continuation of current precautionary measures.[35] As Dr. Fauci has stated, "[w]e will have coronavirus in the fall . . . . I am convinced of that because of the degree of

---

[32] Devan Cole, *Fauci Admits Earlier Covid-19 Mitigation Efforts Would Have Saved More American Lives*, CNN (Apr. 12, 2020), https://www.cnn.com/2020/04/12/politics/anthony-fauci-pushback-coronavirus-measures-cnntv/index.html.

[33] Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine (last visited Apr. 21, 2020); Declaration of Dr. Jonathan Louis Golob at ¶ 8, ECF No. 5, *Dawson v. Asher*, No. 2:20-cv-00409-JLRMAT (W.D. Wash. Mar. 16, 2020).

[34] A prohibition on gatherings greater than 5 people was announced in Executive Order 7N, and was extended through June 20 in Executive Order 7PP. Conn. Exec. Order No. 7 N (Mar. 26, 2020), https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7N.pdf; Conn. Exec. Order No. 7PP (May 18, 2020), https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7PP.pdf. On May 29, Governor Lamont issued Executive Order 7TT, allowing for indoor gatherings of up to 10 people and outdoor gatherings of up to 25 people. Conn. Exec. Order No. 7TT (May 29, 2020), https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7TT.pdf. Soon after, he allowed for "drive-in" ceremonies for very limited occasions. Conn. Exec. Order No. 7XX (Jun. 5, 2020), https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7XX.pdf.

[35] Christina Maxouris, *US Could be in for 'a Bad Fall and a Bad Winter' if it's Unprepared for a Second Wave of Coronavirus, Fauci Warn*, CNN (Apr. 29, 2020), https://www.cnn.com/2020/04/29/health/us-coronavirus-wednesday/index.html.

transmissibility that it has, the global nature."[36] He also noted that he "can't guarantee" in-person voting will be safe in November, because of a potential resurgence of COVID-19 in the fall.[37]

31.    Of course, this litigation is not seeking to eliminate in-person voting options, which are important for voters with accessibility needs due to disability, low-English proficiency, or illiteracy, and to those who do not have access to reliable mail service, among others. Plaintiffs are merely seeking that a vote-by-mail option be available to all Connecticut voters.

32.    The CDC has issued specific guidelines concerning voting during the COVID-19 pandemic. Among other things, it notes that states like Connecticut "with only in-person voting on a single day are higher risk for COVID-19 spread because there will be larger crowds and longer wait times," and that ways to lower risk providing a "a wide variety of voting options," "longer voting periods (more days and/or more hours)," and "any other feasible options for reducing the number of voters who congregate indoors in polling locations at the same time."[38] In other words, by expanding mail voting, states will decrease the risk to voters at polling places.

33.    But for many Americans—particularly people who are older, immune-compromised, or have underlying health conditions that put them at high-risk for severe COVID-

---

[36] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/.

[37] Jason Silverstein, *Fauci says he "can't guarantee" in-person voting in November will be safe Fauci Says He "Can't Guarantee" In-Person Voting in November Will be Safe,* CBS News (Apr. 13, 2020), https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-in-person-voting-in-november-will-be-safe/?ftag=CNM-00-10aac3a.

[38] Ctrs. for Disease Control & Prevention, *Considerations for Election Polling Locations and Voters*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020).

19 infections—voting by mail will be, by far, the safest option for casting a ballot in November.

34.     Accordingly, more than 800 public health experts have called "on our leaders to prepare for a Presidential election by mail, in which ballots are sent to all registered voters, to allow them to vote from home and ensure their health and safety" in November 2020, because "Americans should never again be asked to choose between performing one of the most hallowed obligations and privileges of citizenship—voting for our representatives at the local, state and federal levels—and our health."[39]

35.     These are essential recommendations given the relatively minimal risks of voting by mail versus voting in person during the pandemic. There is no evidence that SARS-CoV-2 can be spread through the mail, and the U.S. Postal Service has further changed their policies to "eliminate the requirement that customers sign our Mobile Delivery Devices for delivery" and now require the customer "to step back a safe distance or close the screen door/door so that they may leave the item in the mail receptacle or appropriate location by the customer door."[40]

36.     In contrast, the risks of interpersonal interaction while voting at a polling place are already evident. A recent study found that COVID-19 bearing droplets could travel as far as 23 to 27 feet as part of a "turbulent gas cloud" exhaled by an infected individual.[41] During Florida's recent primary, two Broward County poll workers tested positive for COVID-19, one of whom

---

[39] Sam Hananel, *RELEASE: More Than 800 Public Health Experts Urge Congress To Fund Vote by Mail in November*, Center for American Progress (May 5, 2020), https://www.americanprogress.org/press/release/2020/05/05/484590/release-800-public-health-experts-urge-congress-fund-vote-mail-november/.

[40] United States Postal Service, *Media Statement – COVID-19* (Apr. 30, 2020), https://about.usps.com/newsroom/statements/usps-statement-on-coronavirus.htm (citing guidance from World Health Organization, CDC, and Surgeon General).

[41] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19*, JAMA Insights (Mar. 26, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763852.

was handling driver's licenses as part of the identification verification process.[42] And on April

13, Chicago officials reported that a poll worker for the city's March 17 election died of COVID-

19, prompting officials to send letters notifying voters, poll workers, field investigators, and

cartage companies who were present at the same polling site.[43]

      37.     Elections held on April 7 in Wisconsin saw multi-hour waits and lines stretching

blocks upon blocks in places like Milwaukee and Green Bay, in part, because government

officials there were unable to create a viable vote-by-mail process for all voters. Crowded lines at

polling places are prime locations for person-to-person contagion. And indeed, the Wisconsin

Department of Health Services has directly traced and linked 71 confirmed cases of COVID-19

to people who voted in-person voting in the April 7 primary.[44] More recently, a team of

economists found "a statistically and economically significant association between in-person

voting and the spread of COVID-19 two to three weeks after the election" in Wisconsin.[45]

      38.     Since then, there have been hours-long waits at polling places on Election Day in

---

[42] Anthony Man, *Two Broward Poll Workers, Including One Who Handled Voters' Driver Licenses, Test Positive for Coronavirus*, S. Fla. Sun Sentinel, Mar. 26, 2020, https://www.sun-sentinel.com/coronavirus/fl-ne-browardelections-poll-workers-coronavirus-20200326-wmgy775dvjc5jis2oagxlpmule-story.html.

[43] *See* Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, NBC Chicago, Apr. 13, 2020, https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.

[44] Dee J. Hall, *Study: Poll Closings, COVID-19 Fears, Kept Many Milwaukee Voters Away*, Wis. Public Radio (June 24, 2020), https://www.wpr.org/study-poll-closings-covid-19-fears-kept-many-milwaukee-voters-away; Associated Press, *The Latest: 52 Positive Cases Tied to Wis. Election* (Apr. 28, 2020), https://apnews.com/b1503b5591c682530d1005e58ec8c267/.

[45] Chad D. Cotti, et al., *The Relationship between In-Person Voting, Consolidated Polling Locations, and Absentee Voting on Covid-19: Evidence from the Wisconsin Primary*, NBER Working Paper Series, Working Paper 27187 (May 2020, revised June 2020), *available at* https://www.nber.org/papers/w27187; *see also* Phillip Alvelda, *COVID-19 Cases and Deaths Surge: The Impact of Wisconsin's In-person Primary Vote*, Inst. For New Econ. Thinking (May 27, 2020), https://www.ineteconomics.org/perspectives/blog/covid-19-cases-and-deaths-surge-the-impact-of-wisconsins-in-person-primary-vote (documenting "a measurable resurgence of the virus within six days of the in-person April 7, 2020 primary election vote").

other states around the country, as well.[46]

## II.    COVID-19 in Connecticut

39.    The COVID-19 pandemic has deeply affected Connecticut.  As of June 30, 2020, the State had confirmed over 46,500 cases.[47] Over 4,300 people in Connecticut have died from the disease.[48] And the confirmed number of cases may be significantly lower than the actual total. The FDA recently issued an alert about the accuracy of one of the widely used rapid tests for COVID-19 after researchers at New York University found those tests could be "missing a third to almost half of the positive cases."[49]

40.    As has been the case nationally, Connecticut residents of all ages have tested positive and died of COVID-19. Connecticut was home to one of the youngest people in the world to die of COVID-19, a 7-week old infant.[50] Researchers have declared that Connecticut has been among the states most severely impacted by the pandemic in the United States.[51]

41.    Models used by health officials predict a sustained outbreak in Connecticut will continue into the summer, if not longer.[52] Indeed, how quickly the state reopens over the next

---

[46] *See, e.g.,* Steve Peoples & Christina Cassidy, *'It's Broken': Fears Grow About Patchwork US Election System* (June 11, 2020), https://apnews.com/550d11a97af645b1d6e64ad2047cd72a (Las Vegas voters were in line to vote until 3am for the June 9, 2020 Nevada primary).

[47] *Conn. COVID-19 Data Tracker*, Conn.'s Official State Website, https://portal.ct.gov/Coronavirus/COVID-19-Data-Tracker (last updated June 30, 2020).

[48] *Id.*

[49] Salvador Rodriguez, *FDA Issues Warning on Accuracy of Abbott's Rapid Coronavirus Test After Study Finds False Negatives,* CNBC (May 14, 2020), https://www.cnbc.com/2020/05/14/fda-data-suggests-abbotts-rapid-coronavirus-diagnostic-test-is-delivering-inaccurate-results.html.

[50] *Newborn in Conn. Dies of Coronavirus*, NBC Conn. (last updated Apr. 3, 2020), https://www.nbcconnecticut.com/news/local/newborn-in-connecticut-dies-of-coronavirus/2248709/.

[51] Forrest W. Crawford, et. al, *COVID-19 Projections for Reopening Connecticut*, Yale School of Pub. Health (May 20, 2020) at 1.

[52] *See* Institute for Health Metrics and Evaluation, *COVID-19 Projections: Connecticut*, https://covid19.healthdata.org/united-states-of-america/connecticut (last visited May 27, 2020).

18

few weeks will have a major impact on whether there will be an uptick in COVID-19 infection rates and deaths in September and beyond.[53]

42.      On March 10, Governor Lamont declared both public health and civil preparedness emergencies—emergency declarations that currently remain in effect until September 9, 2020.[54] On March 29, President Trump approved a major disaster declaration for Connecticut, which made federal emergency aid available for recovery efforts due to the COVID-19 pandemic.[55]

43.      To combat viral spread, Governor Lamont has taken a series of increasingly aggressive steps since early March, including by issuing several dozen executive orders.

44.      The Governor's executive orders have had the incremental effect of closing down most "non-essential" businesses, closing schools and requiring residents of the State to "Stay Safe, Stay Home" and essentially shelter in place.

45.      In coordination with the Secretary of State, Governor Lamont initially postponed Connecticut's presidential preference primary from April 28 until June 2.[56] In light of the

---

[53] Michael Greenwood, *"Risk of Resurgence" in COVID-19 Epidemic if Connecticut Reopens Too Quickly, YSPH Report Finds*, Yale School of Medicine (May 22, 2020), https://medicine.yale.edu/news-article/24924/ (If the state reopens at a fast pace "(defined as increasing contact at a rate of 10 percent every two weeks), Crawford and colleagues found that the number of new infections is likely to spike throughout the summer, potentially exceeding hospitalization capacity and resulting in anywhere from 5,400 to 13,400 total deaths by September 1.") (referencing Crawford et. al, *supra* n.51).

[54] Governor Ned Lamont, *Declaration of Public Health and Civil Preparedness Emergencies* (Mar. 10, 2020), https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2020-03/Connecticut%2020200310-declaration-of-civil-preparedness-and-public-health-emergency.pdf

[55] *Governor Lamont Announces Approval of Fed. Disaster Declaration for COVID-19 Response in Conn.*, Office of Governor Ned Lamont (March 29, 2020), https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/03-2020/Governor-Lamont-Announces-Approval-of-Federal-Disaster-Declaration.

[56] *Governor Lamont Orders Conn.'s Presidential Primary Election Rescheduled to June 2*, Office of Governor Ned Lamont (Mar. 19, 2020), https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/03-2020/Governor-Lamont-Orders-Connecticuts-Presidential-Primary-Election-Rescheduled-to-June-2.

ongoing public health crisis, he then further rescheduled it until August 11.[57]

46.     This Court has taken similar steps in light of the pandemic, including suspending

all jury trials and continuing all in court civil and criminal proceedings until June 15, 2020.[58]

And on June 12, this Court continued to acknowledge "the public health risks presented by in-

court appearances" by giving individual judges the discretion as to "whether it is in the interests

of justice to hold any non-jury civil or criminal proceeding in the courtroom."[59]

47.     The Connecticut legislature also stopped meeting due to the public health crisis on

March 11 and did not reopen before its session adjourned on May 6.[60] The Governor has called

for a special session at some point this summer to address both absentee voting in November and

police accountability measures, but none has been scheduled to date.

48.      The presidential general election will take place on November 3, 2020. Printed

absentee ballot sets will become available to voters starting on October 2, 2020. Conn. Gen. Stat.

Ann. §9-140(f).[61] The deadline to request an absentee ballot for the November election is

November 2, 2020.

49.      Secretary Merrill has already announced that she plans to mail all registered

---

[57] *Governor Lamont Orders Conn.'s Presidential Primary Election Further Rescheduled to August 11*, Office of Governor Ned Lamont (Apr. 17, 2020), https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/04-2020/Governor-Lamont-Orders-Connecticuts-Presidential-Primary-Election-Further-Rescheduled-to-August-11.

[58] General Order, *In re: Court Operations Under the Exigent Circumstances Created By COVID-19,* U.S. Dist. Ct. Dist. of Conn. (Apr. 27, 2020), http://www.ctd.uscourts.gov/sites/default/files/4-27-20-COVID-19-Superseding-General-Order-Re-Court-Operations__0.pdf.

[59] General Order, *In re: Court Operations Under the Exigent Circumstances Created By COVID-19,* U.S. Dist. Ct. Dist. of Conn. (June 12, 2020), http://ctd.uscourts.gov/sites/default/files/General-Order-61220.pdf.

[60] Christine Stuart, *When Can Connecticut Lawmakers Get Back to Work?*, NBC Conn., May 22, 2020, www.nbcconnecticut.com/news/local/when-can-connecticut-lawmakers-get-back-to-work/2275951/.

[61] *See also* November 3, 2020 State Election Calendar, Office of Sec'y of State (Dec. 2019) at 29, https://portal.ct.gov/-/media/SOTS/ElectionServices/Calendars/2020Election/2020-Calendar.pdf?la=en.

voters an application to vote via absentee ballot for both the August primary and the November

general election.[62] While a positive step for voter access, carrying out this plan in the absence of

an expansion of eligibility to vote via absentee ballot to all registered voters for November will

cause confusion among voters and local election administrators. A voter who receives an

absentee ballot application form in the mail in September or October may be misled to believe

that they are eligible to vote absentee during the November general election; and potentially

result in many thousands of voters who do not qualify for absentee ballots believing that there is

no need to go to the polls on Election Day. This confusion may be heightened by the fact that

many voters successfully voted via an absentee ballot during the August primary but currently

will not be allowed to utilize that process for the November general election.

### III.    COVID-19's Impact on Black Americans in Connecticut in Light of Ongoing and Historical Discrimination

50.    Nationally, the COVID-19 pandemic has had a particularly devastating effect on

Black communities. An analysis by the Associated Press—one of the first attempts to examine the

racial disparities of COVID-19 cases and deaths nationwide—found that, in areas where the

demographic data has been publicly shared by government officials, Black Americans have made

up 42% of people who have died from COVID-19, despite accounting for roughly only 21% of

the total population in these areas.[63] And a CDC report published on April 8, 2020, which included

---

[62] *Press Release: Secretary Merrill Releases Connecticut's Election Plan in the Face of COVID-19*, Office of the Sec'y of State, (May 4, 2020), https://portal.ct.gov/SOTS/Press-Releases/2020-Press-Releases/Secretary-Merrill-Releases-Connecticuts-Election-Plan-in-the-Face-of-COVID19 ("The circumstances of the current pandemic make physically appearing in a polling place difficult or impossible for many voters. In an effort to ensure that every eligible voter who wants to cast a ballot is able to do so, the Office of the Secretary, contracting with a mail house, will be sending applications for absentee ballots **to every registered voter in the state**, and including postage paid return for those applications.") (emphasis added).

[63] Kat Stafford et al., *Outcry Over Racial Data Grows as Virus Slams Black Americans*, Associated Press (Apr. 8, 2020), https://apnews.com/71d952faad4a2a5d14441534f7230c7c?fbclid=IwAR1plunY_qfeA2KrSUPA1TuJobAwQh53a_Qlkf5dw0dWjz-iz85GA1FOt4.

data from 1,482 patients hospitalized across 14 states, found that Black patients made up 33% of those for whom race or ethnicity information was available, despite representing only 18% of the states' populations.[64] As such, the CDC observed that current data on the COVID-19 pandemic "suggest a disproportionate burden of illness and death among racial and ethnic minority groups."[65]

51.     A recent Harvard study also confirms the ugly truth that Black Americans and Latino Americans between the ages of 24 and 54 are far more likely to die of COVID-19 than whites, with COVID-19 mortality rates ranging from *five-to-nine fold higher* among racial minorities than whites.[66]

52.     Courtney Cogburn, an associate professor at the Columbia University School of Social Work, noted that "[t]here are patterns at this intersection of race and socioeconomic status that make it very clear this is just not a story about poverty." That is, racial disparities in serious illness and death due to COVID-19 are inextricably linked to a long history of and ongoing patterns of racial discrimination against Black Americans:

> A history of systemic racism and inequity in access to health care and economic opportunity has made many African Americans far more vulnerable to the virus. Black adults suffer from higher rates of obesity, diabetes and asthma, which make them more susceptible, and also are more likely to be uninsured.  They also often

---

[64] Morbidity and Mortality Weekly Report, Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019—COVID-NET, 14 States, March 1-30, 2020, CDC (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf.

[65] *COVID-19 in Racial and Ethnic Minority Groups*, CDC (last updated June 16, 2020), https://www.cdc.gov/minorityhealth/newsletter/2020/summer/news.html.

[66] MT Bassett, et al., T*he unequal toll of COVID-19 mortality by age in the United States: Quantifying racial/ethnic disparities*, Harvard Ctr. For Development & Population Studies, June 12, 2020, https://cdn1.sph.harvard.edu/wp-content/uploads/sites/1266/2020/06/20_Bassett-Chen-Krieger_COVID-19_plus_age_working-paper_0612_Vol-19_No-3_with-cover.pdf.

report that medical professionals take their ailments less seriously when they seek treatment.[67]

53.     These trends are now quite apparent in Connecticut. As of June 29, Black Connecticut residents tested positive for COVID-19 at well over twice the rate of white Connecticut residents.[68] And Black Connecticut residents are also dying of COVID-19 at a significantly higher rate than white Connecticut residents.[69]

54.     As CEO of the Connecticut Convergence Institute Dr. Cato Laurencin explained, this higher infection rate for Black communities is linked to social inequality such as less reliable health care access, higher rates of chronic illness, employment in jobs requiring more interpersonal interaction, and denser living environments that make social distancing harder—all of which "have a common thread of racism or discrimination."[70]

55.     And as the Connecticut Health Foundation has detailed:

> Even before this pandemic, people of color in Connecticut were more likely to live in poor health than their white counterparts and, for black residents, to die younger. . . . These differences are not accidental, nor are they the result of biological differences between people of different races. Instead, they reflect differences in the opportunities and barriers to being healthy–differences that are rooted in structural racism and bias."[71]

56.     As of 2018, Black Connecticut residents lacked health insurance at higher rates

---

[67] Stafford, et al., *supra* n.63.

[68] *COVID-19 Update June 28, 2020*, Conn. Official State Website (last updated June 28, 2020), https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary6282020.pdf.

[69] *Id.*

[70] Siobhan McGirl, *The Mental Health Effects of COVID-19 on Communities of Color*, NBC Conn., (revised Apr. 24, 2020), https://www.nbcconnecticut.com/news/local/the-mental-health-effects-of-covid-19-on-communities-of-color/2260124/ (citing a research article co-authored by Dr. Laurencin on the racial disparities in how COVID-19 affects Connecticut residents).

[71] *COVID-19 in Context: Why We Need to Understand the Roots of Health Disparities*, Conn. Health Foundation (Apr. 16, 2020), https://www.cthealth.org/latest-news/blog-posts/covid-19-in-context-why-we-need-to-understand-the-roots-of-health-disparities/.

than white residents,[72] and they were also less likely to have a personal doctor or health care

provider.[73] Black Connecticut residents also experience conditions which lead to greater

complications from COVID-19 (including asthma, high blood pressure, obesity, and diabetes) at

higher rates than other groups.[74]

      57.    Racial discrimination in Connecticut has also resulted in socioeconomic

inequalities that disadvantage Black Americans, like higher rates of unemployment, disability,

poverty, and inadequate health insurance than white people. These factors also make it more

likely that Black voters in Connecticut are forced to work outside the home even during the

current pandemic and are therefore more exposed to COVID-19.

**IV.    Connecticut's Absentee Voting Process**

      **A.  Constitutional and Statutory Framework for Allowing Absentee Voting**

      58.    The Connecticut Constitution provides that the "general assembly may provide by

law for voting . . . by qualified voters of the state who are unable to appear at the polling place on

the day of election because of absence from the city or town of which they are inhabitants or

because of sickness, or physical disability or because the tenets of their religion forbid secular

---

[72] *Uninsured Rates for the Nonelderly by Race/Ethnicity*, Kaiser Family Foundation, https://www.kff.org/uninsured/state-indicator/rate-by-raceethnicity/?currentTimeframe=0&selectedRows=%7B%22wrapups%22:%7B%22united-states%22:%7B%7D%7D,%22states%22:%7B%22connecticut%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[73] *Adults Who Report Not Having a Personal Doctor/Health Care Provider by Race/Ethnicity*, Kaiser Family Foundation, https://www.kff.org/other/state-indicator/percent-of-adults-reporting-not-having-a-personal-doctor-by-raceethnicity/?currentTimeframe=0&selectedRows=%7B%22wrapups%22:%7B%22united-states%22:%7B%7D%7D,%22states%22:%7B%22connecticut%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[74] Nepaul et al., *The Burden of Asthma in Connecticut 2012 Surveillance Report,* Conn. Dep't of Public Health at 23 (2012), https://portal.ct.gov/-/media/Departments-and-Agencies/DPH/dph/hems/asthma/pdf/Fullreportwithcoverpdf.pdf?la=en; Conn. Dep't of Public Health, *Conn. Cardiovascular Disease Statistics Rep.* at 13, 19, and 25 (Sept. 2017), https://portal.ct.gov/-/media/Departments-and-Agencies/DPH/dph/hems/chronic_dis/HeartDisease/2017_CVDStats_CT_8Sept2017final-pdf.pdf?la=en.

activity." Conn. Const. art. VI, § 7.

59.     The General Assembly has implemented this provision more narrowly in some respects than the Connecticut Constitution allows, providing that eligible voters "may vote by absentee ballot if he or she is unable to appear at his or her polling place during the hours of voting for any of the following reasons: (1) His or her active service with the armed forces of the United States; (2) his or her absence from the town of his or her voting residence during all of the hours of voting; (3) his or her illness; (4) his or her physical disability; (5) the tenets of his or her religion forbid secular activity on the day of the primary, election or referendum; or (6) the required performance of his or her duties as a primary, election or referendum official. . . ." Conn. Gen. Stat. § 9-135.

**B.  Recent Expansion of Absentee Voting for the Primary Election**

60.     On May 6, 2020, Secretary Merrill issued a Memorandum of Opinion using her authority under Connecticut General Statutes §9-3 to clarify "the definition of "Illness" for Absentee Balloting at a time when the Governor has declared a public health and civil preparedness emergency throughout the State of Connecticut."[75] This guidance was issued to all of the state's town clerks and registrars of voters. In it, Secretary Merrill explained that the "illness" excuse for voting absentee would cover a much broader set of voters for the upcoming August primary, in light of the lack of limiting statutory language, the dictionary definition of illness, and the CDC's identification of numerous underlying medical conditions that put some individuals at higher risk for severe COVID-19 infection as "pre-existing illnesses." Secretary Merrill's interpretation did not universally expand absentee voting to all registered voters but it did allow voters who

---

[75] Office of Sec'y of State, Mem. of Op. re: Re: Absentee Balloting Voting During a State of Health Emergency (May 6, 2020), https://portal.ct.gov/-/media/SOTS/ElectionServices/LEAD_Communications/2020/AB-COVID-Opinion.pdf.

previously would not have been able to vote absentee to do so for the August primary (including those with pre-existing illnesses, those who had been in contact with people infected with COVID-19, individuals caring for someone at increased risk of contracting COIVD-19, and voters who "feel ill or think they are ill because of the possibility of contact with the COVID-19 virus").

61.     At the beginning of her opinion, Secretary Merrill wrote that her purpose was to ensure safe voter participation in the August primary election and was done pursuant to emergency powers that currently expire in September. It appears, therefore, that this definition of illness exists only through the State of Emergency and thus for the August primary, but not currently for the November election. It is unclear whether this guidance would continue based on the declaration of a new public health and/or civil preparedness emergency.

62.     On May 20, 2020, Governor Ned Lamont issued Executive Order No. 7QQ, which made a number of temporary revisions to the state absentee balloting procedures in order to allow safe voting in the August 11 primary. Among other reasons for expanding the opportunity to vote by mail for that election, Governor Lamont cited to the fact that "absentee voting offers a proven method of secure voting that reduces the risk of transmission of COVID-19 by allowing individuals to vote by mail and by reducing the density of in-person voting at polling place."[76]

63.     Under Governor Lamont's May 20 Executive Order, all eligible Connecticut voters may legally vote via absentee ballot for the August 11 primary, "if, at the time he or she applies for or casts an absentee ballot for the August 11, 2020 primary election, there is no federally approved and widely available vaccine for prevention of COVID-19." In his order, Governor Lamont also mandated several changes to the typical absentee voting process for the August

---

[76] *Protection of Public Health and Safety During COVID-19 Pandemic and Response – Safe Voting During Statewide Primary*, Executive Order No. 7QQ (May 20, 2020), https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7QQ.pdf.

primary, including: (1) addition of a notice on absentee ballot envelopes explaining who is eligible; (2) explicit authorization for Secretary Merrill to make any modifications necessary to accurately inform voters of their absentee voter eligibility under the executive order (notwithstanding contrary legal provisions, if any); (3) authorization for municipal clerks to use third party vendors to mail absentee voting sets for the August 11 primary; and (4) authorization for voters to "mail" their ballots via secure drop boxes.

64.     The clear import of Governor Lamont's executive order is that the expansion of absentee voting eligibility applies only to the August 11 primary election and does not extend to the November general election.

### C.   Safeguards in Place to Secure the Absentee Balloting Process

65.     Potential voters may apply for an absentee ballot by filling out an application and mailing it to their municipal clerk. In addition to making absentee ballot applications available online for downloading and printing, Secretary of State Merrill recently announced that—notwithstanding the restrictive Excuse Requirements currently remaining in effect for the general election—her office "will provide an absentee ballot application to all eligible voters for the 2020 primary and general elections."[77] The application asks the individual for their name, date of birth, address and other contact information, how they wish to receive the ballot (by mail for most voters), the election for which the absentee ballot is requested, and the "excuse" for which they require the ballot. It also requires applicants to sign a declaration under penalty of perjury, and for anyone who provided assistance to the individual completing the application to sign a similar

---

[77] Ltr. from Conn. Sec. of State Denise Merrill at 9, May 2, https://authoring.ct.gov/-/media/SOTS/ElectionServices/2020-Voting-Plan-FINAL-DRAFT-May-2-715-PM.pdf?la=en.

declaration.[78]

66.     Once an application is received, the municipal clerk must "check the name of each absentee ballot applicant against" the most recent voter registration lists and only send ballots to those who appear on the list. Conn. Gen. Stat. § 9-140(c). For individuals who do not appear on the list, the clerk must send them a notification but will not transmit a ballot. *Id.*

67.     Connecticut has a number of laws governing the handling of absentee ballot applications, including laws that prohibit providing or accepting compensation to distribute or assist an individual in completing an absentee ballot. Conn. Gen. Stat. § 9-140(j). Another provision mandates that an individual who distributes five or more absentee ballot application outside of their immediate family or designees must register with the town clerk, maintain a list of individuals to who they distributed applications, and file that list with the town clerk prior to the relevant election day. Conn. Gen. Stat. § 9-140(k). Any person who willfully violates these provisions "shall be guilty of a class D felony." Conn. Gen. Stat. § 9-359.

68.     When the clerk reviews the application, verifies it meets the requirements and that the individual is on the voter registration, they mail out to the voter "an absentee ballot, inner and outer envelopes for its return, instructions for its use, and if applicable, explanatory texts concerning ballot questions." Conn. Gen. Stat. § 9-140(d).

69.     To properly submit an absentee ballot, the voter must fill out the ballot as instructed, insert it into the inner envelope, and sign the form on the inner envelope "under the penalties of false statement in absentee balloting." Conn. Gen. Stat. § 9-140a. That form requires a voter to

---

[78] Application for Absentee Ballot, https://portal.ct.gov/-/media/SOTS/ElectionServices/ElectForms/electforms/aabengpdf.pdf?la=en (The declaration of the absentee ballot applicant reads: "I declare, under the penalties of false statement in absentee balloting, that the above statements are true and correct, and that I am the applicant named above."); *see also* Conn. Gen. Stat. § 9-140.

state that they are eligible to vote in the jurisdiction and that they "expect to be unable to appear at my polling place during the hours of voting at such primary, election or referendum" based on one of the designated excuses in the Excuse Requirement. Conn. Gen. Stat. § 9-137. The voter then must insert the inner envelope into the outer envelope. Conn. Gen. Stat. § 9-140a.

70.     The voter may submit the ballot in several ways, including:

   a.   By mail if it is mailed by the voter, "a designee of a person who applies for an absentee ballot because of illness or physical disability," or "a member of the immediate family of an applicant who is a student," such that is received by the municipal clerk by the close of the polls.

   b.   In person by the voter to the clerk by the day before the election, or by a "designee of an ill or physically disabled" voter or immediate family member by close of the polls on Election Day.

Conn. Gen. Stat. § 9-140b. This year, Secretary of State Merrill has also committed to providing secure drop boxes for in-person submission of absentee ballots to avoid person-to-person contact.[79]

71.     In examining the submitted absentee ballots, the clerk must reject ballots where (a) the inner envelope statement is not signed by the voter, or (b) a first-time voter registered by mail but did not submit the appropriate identification. Conn. Gen. Stat. Ann. § 9-150a(d).

72.     Connecticut also has a number of criminal penalties directed at improper voting by absentee ballot and otherwise. For example, individuals are subject to criminal penalties if they are "not legally qualified [and] fraudulently vote[]" in any election, if they are legally qualified but "fraudulently vote[] more than once at the same" election, or if they vote "by assuming the name of another legally qualified person." Conn. Gen. Stat. § 9-360.

73.     Additionally, any individual who "intentionally makes a false written statement in

---

[79] Ltr. from Conn. Sec. of State Denise Merrill, *supra* n.1 at 9.

or on [an absentee ballot application] or signs the name of another person to the application for an absentee ballot or the inner envelope accompanying any such ballot" faces a class D felony. Conn. Gen. Stat. § 9-359a. And any "person who unlawfully opens or fills out" any voter's absentee ballot or otherwise willfully violates any absentee balloting law "shall be guilty of a class D felony." Conn. Gen. Stat. § 9-359. Class D felonies in Connecticut are punishable by up to 5 years of imprisonment and up to $5,000 in associated fines. Conn. Gen. Stat. § 53a-35a(8); Conn. Gen. Stat. § 53a-41(4). These penalties are printed on the absentee ballot application form itself.

**V.    The Challenged Requirements Unduly and Unreasonably Burdens the Voting Rights of Connecticut Residents.**

74.    Historically, most voters in Connecticut vote in person, on Election Day.[80] For most voters, that means physically appearing at a designated polling place where they risk close contact with other voters and poll workers. This also means repeatedly touching shared equipment and material such as voting machines, paper ballots, and writing instruments. At present, public health officials consider all of these activities as risking exposure to and/or transmission of COVID-19. These activities are therefore strongly disfavored and/or proscribed by various government orders.

75.    Meaningful opportunities to vote in person are still necessary for many Connecticut voters, including those who lack access to reliable mail service or need the kinds of accommodations for some persons with disabilities, and personal assistance for people with

---

[80] *See, e.g.*, U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2018 Comprehensive Report* at 29 (2018) (91,602 absentee ballots of over 1.4 million ballots cast in Connecticut in 2018 midterm elections), https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf; U.S. Election Assistance Comm'n, *The Election Admin. and Voting Survey 2016 Comprehensive Report* at 23 (2016) (129,480 absentee ballots of over 1.6 million total ballots cast in Connecticut in 2016 general election), https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf.

limited English literacy, that are only available at in-person voting sites. To reduce the possibility of virus transmission at needed in-person sites, the CDC instructs that states "offer alternative voting methods that minimize direct contact and reduce crowd size at polling locations," and encourage use a "a wide variety of voting options" including "any other feasible options for reducing the number of voters who congregate indoors in polling locations at the same time."[81]

76.     Unlike the vast majority of other states, Connecticut offers no opportunities for in-person early voting.[82] As a result, polling places are more likely to be crowded on Election Day in November 2020 because, under current state law, most voters will only have one option for how to vote: in person on Election Day.

77.     The lack of early in-person voting options in Connecticut also means that some voters with print disabilities[83] who currently fall within the narrow group that may vote absentee will have the choice of either (a) voting privately and independently with accommodations[84] at their polling place on Election Day (but facing heightened risk of viral transmission to do so) or (b) voting absentee using a non-secret ballot with the aid of a competent third-party (provided

---

[81] Ctrs. for Disease Control & Prevention, *Considerations for Election Polling Locations and Voters*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020).

[82] *See, e.g.,* Denise Merrill, *ICYMI: Denise Merrill: It's Time to Allow Voting by Mail*, Office of Sec'y of State Denise W. Merrill (Mar. 31, 2020), https://portal.ct.gov/SOTS/Press-Releases/2020-Press-Releases/ICYMI-Denise-Merrill-Its-time-to-allow-voting-by-mail.

[83] Print disabilities encompass conditions that make it difficult (or impossible) for someone to access standard printed text. The paper ballots provided as part of Connecticut's absentee voting process are inaccessible to many voters with visual impairments, manual impairments, or significant learning disabilities. Unfortunately, at this time, Connecticut has not yet adopted any accessible absentee ballot formats that would allow voters with print disabilities to vote privately and independently.

[84] Voters with print disabilities may rely on voting machines that have special features such as touch screens, headphones, or sip-and-puff devices. Using these accessible technologies could result in transmission of the COVID-19 virus from previous users or poll workers. CDC, *Coronavirus Disease 2019 (COVID-19): How It Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (noting that while the virus spreads most easily from person-to-person, it "may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes") (last updated June 16, 2020).

that someone is available to assist them at home). Both of these voting options will burden the exercise of Connecticut citizens with disabilities' constitutionally protected right to vote. Eliminating the Excuse Requirement would make voting significantly less risky for people with print disabilities who need to vote in person by reducing the total number of people at the polls— which, in turn, reduces the number of interactions with other voters, the number of people touching the voting equipment, and the overall chance of transmission.

78.     Even if COVID-19 cases do not resurge in Connecticut to previous levels, members of vulnerable or "high-risk" populations who would otherwise vote in person on Election Day will reasonably opt and/or be required to continue practicing "social distancing" for the foreseeable future. Those who risk grave medical complications from COVID-19 will reasonably decide to self-quarantine until a vaccine for the illness is developed or a cure is identified.

79.     Because Connecticut is an "excuse required" absentee voting state, eligible voters must fall under one of several enumerated categories of persons who are "qualified" to vote by absentee ballot. Under this statute, even older Connecticut voters and many of those otherwise at high risk of complications from COVID-19 are unable to request an absentee ballot. Defendant Merrill's own webpage describes the limits on who may vote absentee as "strict," as the list of voters who may vote currently via absentee ballot for the November election include only active members of the U.S. armed forces and people who cannot vote in-person due to (a) "his or her" illness, physical disability, or religious beliefs; (b) work as an election official outside of their

assigned polling place; or (c) absence from town during the entirety of voting hours (6 a.m. to 8 p.m.).[85]

80.     As currently construed, the Excuse Requirement severely burdens the fundamental right of all eligible voters practicing self-quarantining and social distancing to participate in elections in Connecticut. In particular, it egregiously burdens the right to vote of persons with pre-existing medical conditions who commonly vote in person and are not considered "physically disabled," by placing them at "high-risk" of exposure to severe illness from COVID-19 (*e.g.*, by being immunocompromised). Older individuals also already face higher rates of infection and death from COVID-19, further magnifying the burden they face in having to vote in-person during community transmission and before there is a widely available and effective vaccine.

81.     The Excuse Requirement will therefore likely prevent tens if not hundreds of thousands of Connecticut voters who might otherwise vote in scheduled elections from participating in those contests, as anyone not covered by an enumerated absentee "excuse" will have to choose between (1) exposing themselves and others to the risk of illness from COVID-19 by voting in person or (2) foregoing their right to vote.

82.     The Excuse Requirement is also particularly burdensome for Black voters in Connecticut. Black voters in Connecticut continue to bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. It is precisely because of these patterns that Black Connecticut residents face particularly severe health risks from COVID-19 exposure arising from being forced to vote

---

[85] *Absentee Voting*, Office of the Sec'y of State Denise W. Merrill, https://portal.ct.gov/SOTS/Election-Services/Voter-Information/Absentee-Voting (last visited June 29, 2020); Conn. Gen. Stat. § 9-174 (setting out poll hours).

in-person rather than by mail. In these circumstances, the Excuse Requirement interacts with these conditions to deny Black Americans in Connecticut an equal opportunity to participate in the political process.

83.     Moreover, Black voters are disproportionately burdened by long lines at the polls. A recent study based on data from millions of smartphone users during the 2016 presidential election found that residents of entirely-Black neighborhoods waited 29% longer to vote and were 74% more likely to spend more than 30 minutes at their polling place than residents of all-white neighborhoods.[86] This disproportionate wait-time problem means that the risks of voting in-person during community transmission of COVID-19 will fall more heavily on Black voters.[87]

84.     Make no mistake, though: the Excuse Requirement will result in long lines for everyone. These longer lines will make it harder to practice adequate social distancing, and likely decreases in the number of polling places and poll workers will cause even longer lines and compound the health risks voters waiting in them will face. Additionally, the fact that Connecticut is one of only a few states without early in-person voting before Election Day means that there will be no opportunities to spread out in-person voting.

85.     The Excuse Requirement is plainly unreasonable in the context of COVID-19 community transmission, which, by current expert predictions, will still be occurring during the absentee voting period for the November 3, 2020, general election at rates that make in-person

---

[86] M. Keith Chen et al., *Racial Disparities in Voting Wait Times: Evidence from Smartphone Data* at 1 (Nov. 14, 2019), https://www.kareemhaggag.com/f/Racial_Disparities_in_Voting_Wait_Times.pdf.

[87] Moreover, Black voters can least afford unnecessarily long wait times as the price to pay for voting, because Black people are "more likely to working in jobs without flexibility or paid sick leave," which means any delays at the polls disproportionately threaten their job security. Laura Williamson, *How to Build a Racially Inclusive Democracy During COVID-19 and Beyond*, Demos (Apr. 28, 2020), https://www.demos.org/policy-briefs/how-build-racially-inclusive-democracy-during-covid-19-and-beyond; Lonnie Golden, *Limited Access: Disparities in Flexible Work Schedules and Work-at-Home*, 29 J. Family & Econ. Issues 86–109 (2008).

voting risky both for individuals and from a public health perspective. The State's refusal to allow all Connecticut voters to vote safely from home in response to the pandemic cannot be justified by any legitimate state interest. The COVID-19 pandemic poses the same concerns for November that led Governor Lamont and Secretary Merrill to make clear that any state interest in a restrictive interpretation of the Excuse Requirement must give way in light of the COVID-19 pandemic.[88] By taking steps to permit all Connecticut voters to use mail-in ballots to vote safely from home in the August 11, 2020, primary, Defendant Merrill has made clear that the pandemic necessitates such changes in Connecticut.

86.     Because the significant weight of the scientific and epidemiological evidence indicates that COVID-19 will pose a threat to the health of Connecticut residents for the remainder of 2020, if not longer, it is unreasonable not to waive the Excuse Requirement for the November election as well. Public health officials are "convinced" that COVID-19 will continue to threaten voters' health and safety this fall, both because of the looming second wave of the virus and the improbable availability of a vaccine by November 2020.[89] And come November, there will still be no widely available vaccine or the existence of herd immunity such that large numbers of individuals voting in person will be safe.[90]

---

[88] *See* Executive Order No. 7QQ, *supra* n.76; Office of the Sec'y of State, *Mem. of Opinion*, *supra* n.75.

[89] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/.

[90] TEGNA, *FDA Approves Coronavirus Vaccine Candidate to Begin Phase 2 Trial*, WUSA 9 (May 7, 2020), https://www.wusa9.com/article/news/health/coronavirus/fda-approves-coronavirus-vaccine-candidate-to-begin-phase-2-trial/507-7119865c-3ffb-42b0-8066-6df24aae2c5d ("Dr. Anthony Fauci, the U.S. government's top expert, has cautioned that even if everything goes perfectly, 12 to 18 months to develop a vaccine would set a speed record. January will mark a year since the National Institutes of Health began creating its COVID-19 vaccine with Moderna."); *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12*, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12.

87.    Indeed, at least some other states that require an excuse to vote by mail are already taking action for November to widen the scope of mail-voting eligibility to all registered voters. In New Hampshire, for example, the State has interpreted its "physical disability" provision to "appl[y] equally to voters who are experiencing symptoms of COVID-19 . . . and those who are self-quarantining as a preventative measure" for all elections this year.[91]

## CLAIM FOR RELIEF
## COUNT ONE
### Violation of the Fundamental Right to Vote
### 42 U.S.C. § 1983, First and Fourteenth Amendments to the U.S. Constitution

88.    Eligible individuals have a fundamental right to vote under the First and Fourteenth Amendments of the U.S. Constitution. Under the First and Fourteenth Amendments, a court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to the rights that the plaintiff seeks to vindicate against the justifications put forward for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

89.    In light of the COVID-19 pandemic, Connecticut's Excuse Requirement and its enforcement severely and unreasonably burden the fundamental right to vote of Connecticut voters. These requirements will likely prevent many thousands of eligible voters from voting or having their votes counted, and severely burden others who nonetheless do vote in-person by forcing them to risk their health in order to exercise a fundamental right. These burdens will fall particularly heavily on older voters, Black voters, and voters who are at elevated risk of severe illness from COVID-19 but who do not fall within the narrow "illness" or "disability" categories

---

[91] Mem. from the Sec'y of State and Att'y General to N.H. Election Officials re: Elections Operations During the State of Emergency 2 (Apr. 10, 2020), https://www.governor.nh.gov/news-media/press-2020/documents/20200410-absentee-voting.pdf.

that would qualify them to vote by mail under current state law. Yet even if the burdens were less severe, Defendant and the State lack any interest in maintaining the Excuse Requirement that would outweigh these burdens.

90.     Therefore, Defendant, acting under color of state law, has and will continue to deprive Plaintiffs of rights secured to them by the First and Fourteenth Amendments to the U.S. Constitution—namely, the fundamental right to vote—and protected by 42 U.S.C. § 1983 by enforcing the Excuse Requirement.

## COUNT TWO
### Violation of Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301

91.     Section 2 of the Voting Rights Act provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a).

92.     The "essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *League of Women Voters of North Carolina v. North Carolina* ("*LWV*"), 769 F.3d 224, 238–39 (4th Cir. 2014) (internal quotation marks and citation omitted). "[A] Section 2 vote-denial claim consists of two elements:

> First, the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
>
> Second, that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

37

*LWV*, 769 F.3d at 240 (internal quotation marks and citations omitted).

93.     The Excuse Requirement, if not enjoined, will materially burden the right to vote, and will have an adverse and disparate impact on Black voters in Connecticut. Black voters in Connecticut are more likely to work in jobs that expose them to COVID-19, less likely to have insurance or financial resources, and more likely to suffer from severe health complications and/or to die from COVID-19 than white voters.  Black voters are therefore significantly more burdened by the effects of the Excuse Requirement.

94.     The disparate burden resulting from the Excuse Requirement is directly linked to social and historical conditions. Connecticut has a long history of voting-related discrimination, including elected officials actively discouraging minority voting by disproportionate purging from the voter rolls and as reflected in minority districts having the lowest voter turnout, "markedly racially polarized" voting patterns that prevented the election of minority candidates, and the inability of an Black individual to win the Democratic Party's endorsement, among other

things.[92] Black voters in Connecticut also bear the effect of historical discrimination in activities

ranging from public education[93] to hiring practices[94] to residential housing patterns.[95]

95.     Black Connecticut residents continue to suffer from discrimination in areas such

as education, employment, and health, which hinders their ability to participate effectively in the

political process. According to 2018 data from the American Community Survey compiled by

the United States Census Bureau, in Connecticut, 6.8% of Black individuals and only 3.1% of

non-Hispanic white people lack health insurance;[96] 12.8% of Black people and only 5.2% of

non-Hispanic white people lack a high school degree and twice as many non-Hispanic white

Connecticut residents had college degrees as their Black peers;[97] 18.6% of Black households and

---

[92] These findings are documented in *Bridgeport Coal. for Fair Representation v. City of Bridgeport*, No.3:93-cv-1476(PCD), 1993 WL 742750, at *2–4 (D. Conn. Oct. 27, 1993), *aff'd and remanded sub nom. Bridgeport Coal. For Fair Representation v. City of Bridgeport*, 26 F.3d 271 (2d Cir. 1994), *cert. granted, judgment vacated sub nom. City of Bridgeport, Conn. v. Bridgeport Coal. For Fair Representation*, 512 U.S. 1283 (1994).

[93] *Bridgeport Guardians, Inc. v. Delmonte*, 553 F. Supp. 601 (D. Conn. 1982) (holding that city police department discriminated against Black officers in job assignments); *Ass'n Against Discrimination in Employment, Inc. v. City of Bridgeport*, 479 F. Supp. 101, 111 (D. Conn. 1979), *aff'd in relevant part*, 647 F.2d 256 (2d Cir. 1981) (holding that city fire department had violated the Civil Rights Act of 1964 by "engaging in a policy and practice of discrimination against black and Hispanic persons relative to entry-level hiring").

[94] There is a vigorous debate ongoing (as well as litigation) around Connecticut's highly-segregated public school system and the controversial ways the state has attempted to address racial inequities in that system. *See, e.g.*, Lincoln Caplan, *Two Connecticut School Systems, For the Rich and Poor*, THE NEW YORKER (Sep. 14, 2016), https://www.newyorker.com/news/news-desk/two-connecticut-school-districts-for-the-rich-and-poor; Rachel M. Cohen, *A Lawsuit Threatens a Groundbreaking School-Desegregation Case*, THE NATION (Feb. 11, 2019), https://www.thenation.com/article/archive/connecticut-segregation-schools-sheff/.

[95] Kenneth P. Hadden & Thomas Werling, *Residential Segregation in Metropolitan Connecticut*, STORRS AGRICULTURAL EXPERIMENT STATION 1, 7 (1975), https://opencommons.uconn.edu/cgi/viewcontent.cgi?article=1046&context=saes (showing statistically significant rates of race-based residential segregation in Connecticut, and even an increase in such segregation in several of the state's largest cities between 1960 and 1970).

[96] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: Selected Social Characteristics of the United States: Connecticut (2018), https://data.census.gov/cedsci/table?q=S2701&tid=ACSST1Y2018.S2701&hidePreview=true&g=0400000US09.

[97] *Educational Attainment,* U.S. Census Bureau (2018), https://data.census.gov/cedsci/table?q=S1501&tid=ACSST1Y2018.S1501&g=0400000US09&hidePreview=true.

only 6.1% of non-Hispanic white households lived below the poverty line;[98] 24.4% of Black[99] and 6.0% of non-Hispanic white households receive SNAP/food stamps;[100] and non-Hispanic white median family income ($114,393)[101] is nearly double that of Black families ($61,438).[102] In particular, as discussed above, these discriminatory patterns render Black voters more vulnerable to COVID-19, such that the Excuse Requirement is particularly burdensome for them as a group relative to other voters.  In addition, voting is racially polarized in Connecticut and Black residents do not hold elected office in proportion to their population, resulting in state elected officials who are less responsive to the health, voting, and other concerns of Black voters amid the COVID-19 crisis.

96.     Under the totality of the circumstances, the Excuse Requirement interacts with these social and historical conditions to abridge and deny Black Americans in Connecticut the right to vote during the current pandemic.  As a result, Black Americans in Connecticut will have

---

[98] *Poverty Status In The Past 12 Months,* U.S. Census Bureau (2018), https://data.census.gov/cedsci/table?g=0400000US09&tid=ACSST1Y2018.S1701&t=Income%20and%20Poverty&vintage=2018&hidePreview=false&cid=S1701_C01_001E.

[99] *Receipt of Food Stamps/SNAP in the Past 12 Months By Race of Householder (Black or African American Alone),* U.S. Census Bureau (2018), https://data.census.gov/cedsci/table?g=0400000US09&t=Race%20and%20Ethnicity%3ASNAP%2FFood%20Stamps&tid=ACSDT1Y2018.B22005B&hidePreview=false&cid=B01001A_001E&vintage=2018.

[100] *Receipt of Food Stamps/SNAP in the Past 12 Months By Race of Householder (White Alone, Not Hispanic or Latino),* U.S. Census Bureau (2018), https://data.census.gov/cedsci/table?g=0400000US09&t=Race%20and%20Ethnicity%3ASNAP%2FFood%20Stamps&tid=ACSDT1Y2018.B22005H&hidePreview=false&cid=B01001A_001E&vintage=2018.

[101] *Median Family Income in the Past 12 Months (in 2018 Inflation-Adjusted Dollars) (White Alone, Not Hispanic or Latino Householder),* U.S. Census Bureau (2018), https://data.census.gov/cedsci/table?g=0400000US09&t=Race%20and%20Ethnicity&tid=ACSDT1Y2018.B19113H&hidePreview=false&cid=B01001A_001E&vintage=2018.

[102] *Median Family Income in the Past 12 Months (in 2018 Inflation-Adjusted Dollars) (Black or African American Alone Householder),* U.S. Census Bureau (2018), https://data.census.gov/cedsci/table?g=0400000US09&t=Race%20and%20Ethnicity&tid=ACSDT1Y2018.B19113B&hidePreview=false&cid=B01001A_001E&vintage=2018.

less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.      Declare that Connecticut's enforcement and interpretation of the Excuse Requirement (as stated in Conn. Gen. Stat. § 9-135) while the risk of COVID-19 transmission in Connecticut remains violates the fundamental right to vote under First and Fourteenth Amendments to the U.S. Constitution and the Voting Rights Act;

B.      Issue a preliminary and permanent injunction that orders relief including:

1.      Prohibiting Defendant from enforcing the Excuse Requirement (as stated in Conn. Gen. Stat. § 9-135) to prevent any eligible voter, regardless of age and physical condition, to request, receive, and have counted, an absentee ballot, at least while public health officials continue to recommend social distancing practices due to risk of community transmission of COVID-19; and

2.      Ordering Defendant to modify election materials, including absentee ballots and absentee ballot applications, to reflect the elimination of the Excuse Requirement, and conduct a public information campaign informing Connecticut voters about the elimination of the Excuse Requirement, in coordination with local election officials before and during the absentee balloting period, and ordering Defendant to issue guidance instructing local election officials to issue absentee ballots to all eligible voters;

C.      Award Plaintiffs attorneys' fees in this action;

D.      Award Plaintiffs their costs of suit; and

E.      Grant such other and further relief as this Court deems just and proper in the

41

circumstances.

Dated: July 2, 2020                                 Respectfully submitted,


Davin M. Rosborough *                               */s/ Dan Barrett*
Ihaab Syed*                                         Dan Barrett (ct29816)
Dale E. Ho*                                         Elana Bildner (ct30379)
Sophia Lin Lakin*                                   ACLU Foundation of Connecticut
American Civil Liberties Union Foundation           765 Asylum Avenue
125 Broad Street, 18th Floor                        Hartford, CT 06105
New York, NY 10004                                  (860) 471-8471
Tel.: (212) 549-2500                                e-filings@acluct.org
drosborough@aclu.org
isyed@aclu.org
dho@aclu.org
slakin@aclu.org

Ceridwen Cherry*
American Civil Liberties Union Foundation
915 15th St NW
Washington, DC 20005
Tel.: (212) 549-2500
ccherry@aclu.org


                                                    *Attorneys for Plaintiffs*


*Motion for admission *Pro Hac Vice*
forthcoming